IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL COUNCIL OF JEWISH WOMEN, GREATER NEW ORLEANS SECTION, 6221 S. Claiborne Avenue #208, New Orleans, LA 70125; | CIV. NO. _____ |
| Plaintiff, | |
| v. | |
| U.S. CITIZENSHIP AND IMMIGRATION SERVICES, 5900 Capital Gateway Drive, Prince George's County, Camp Springs, MD 20746; | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| JOSEPH B. EDLOW, in his official capacity as Director of the U.S. Citizenship and Immigration Services, 5900 Capital Gateway Drive, Prince George's County, Camp Springs, MD 20746; | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, 2707 Martin Luther King Jr. Avenue SE Washington, DC 20528; | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, 2707 Martin Luther King Jr. Avenue SE Washington, DC 20528; | |
| Defendants. | |

**INTRODUCTION**

1.      Every year, hundreds of thousands of people born outside of the United States choose to become Americans. In ceremonies held in government offices, hotel ballrooms, and local libraries, after passing tests and clearing countless hurdles, they swear an oath of allegiance to the United States. In return, these new citizens gain the right to shape the nation they have joined

through one of the most "precious" and "fundamental" rights of American citizenship: "the right to vote." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966).

2.    In recent years, new citizens' power in our democracy has grown. By 2024, one in ten eligible voters was a naturalized citizen. Yet naturalized citizens remain less likely to vote than their native-born peers—largely because fewer are registered. Once registered to vote, naturalized citizens vote at a similar—and sometimes higher—rate as compared to non-naturalized voters. But for many new citizens, America's decentralized, opt-in voter registration system is daunting. Every state has its own rules, and for those still perfecting their English or adjusting to an unfamiliar political system, those rules can be confusing and opaque.

3.    Recognizing these barriers, in 2011, U.S. Citizenship and Immigration Services ("USCIS") issued guidance requiring that new Americans receive both the opportunity to register and—critically—assistance with doing so at their naturalization ceremonies. When local elections officials lacked the resources to provide this assistance, the guidance allowed non-governmental organizations to step into the breach.

4.    That system worked. In the years that followed, a host of nonpartisan organizations—including Plaintiff National Council of Jewish Women, Greater New Orleans Section—diligently filled that role. They guided new citizens through the registration process, answered questions, ensured forms were completed and submitted, and encouraged new citizens to participate in our democracy. Their work ensured that hundreds of thousands of newly-naturalized citizens were able to vote as soon as they were entitled to do so. During that same period, the registration gap between native-born and naturalized citizens was cut nearly in half.

5.    On August 29, 2025, USCIS abruptly shut down these efforts. In a new guidance document, the agency decreed that "effective immediately," for "all naturalization ceremonies held

on or after" August 29, 2025, "[n]ongovernmental entities are not permitted to provide voter registration services." Now, when local officials are unavailable—as they often are—new citizens are left without guidance, and organizations with years of expertise helping new citizens register to vote are barred from providing it. And because naturalization ceremonies provide the only straightforward opportunity to register new citizens *en masse*, the ban effectively bars organizations like Plaintiff from targeted efforts to register naturalized citizens altogether.

6.    USCIS offered little explanation for the ban. But the context in which it was enacted makes its purpose hard to miss. Just weeks before the new policy took effect, USCIS Director Edlow stoked conspiracy theories that have grown alongside immigrants' electoral power—claiming that the prior administration sought to bring nonwhite immigrants to the United States to "make them all citizens, and then spread them out to try to change demographics elsewhere in the country." Around the same time, Defendants rolled out new measures to make the naturalization process harder and the status of new citizens more precarious. Against this backdrop, the ban speaks plainly about whose voices our government welcomes into our democracy—and whose it does not.

7.    Federal agencies may change their policies. But they may not do so for discriminatory reasons—or to mute expressive conduct the government dislikes. Defendants' categorical ban violates these principles. To vindicate its rights, the rights of its members, and the new citizens it seeks to assist and empower with its voter registration program, Plaintiff brings this action for declaratory and injunctive relief under the First and Fifth Amendments to the U.S. Constitution and the Administrative Procedure Act ("APA").

**JURISDICTION & VENUE**

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's federal constitutional claims arise under the First and Fifth Amendments to the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988. The Court has authority to grant Plaintiff declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers. The Court also has jurisdiction under the APA, 5 U.S.C. §§ 701–706. *See Lee v. U.S. Citizenship & Immigr. Servs.*, 592 F.3d 612, 619 (4th Cir. 2010); *Lovo v. Miller*, 107 F.4th 199, 205 (4th Cir. 2024).

9.      Although the United States and its agencies are generally immune from suit unless Congress waives that immunity, *see FDIC v. Meyer*, 510 U.S. 471, 475 (1994), Congress has done so for claims brought under the APA, 5 U.S.C. § 702. Courts—including the Fourth Circuit—have consistently held that this waiver also applies to any claims for non-monetary relief arising under federal law. *See Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 262 (4th Cir. 2022); *see also Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 201 & n.12 (5th Cir. 2024) (collecting cases) ("Every one of our sister circuits has construed § 702's plain language as a waiver of sovereign immunity for all equitable actions, regardless of whether they arise under the APA or other federal law.").

10.     Venue is proper because Defendants are agencies and officers of the United States acting in their official capacities. *See* 28 U.S.C. § 1391(e)(1). USCIS and its Director are headquartered in the District of Maryland, *id.* § 1391(e)(1)(A), and a substantial part of the events giving rise to Plaintiff's claims occurred there, *id.* § 1391(e)(1)(B).

**PARTIES**

11.     Plaintiff is the New Orleans Section of the National Council of Jewish Women. Founded in 1893, the National Council of Jewish Women is the oldest women's volunteer

organization in the United States, with sections in 34 states and the District of Columbia. The New Orleans Section was founded in 1897, and it currently has over 1,000 dues-paying members.

12.     From its founding, the National Council of Jewish Women, Greater New Orleans Section has worked to advance voting rights, and this work is central to its mission. In the Jewish faith, Jewish people are asked to play an active role in the community and in choosing its leaders. Helping people vote is therefore a meaningful expression of Jewish religious and ethical values. Consistent with these principles, Jewish Americans have played an active role advocating for voting rights, including during the civil rights era, when parts of the Voting Rights Act of 1965 were drafted at the Religious Action Center for Reform Judaism.

13.     In keeping with those ideals, voter registration assistance is a core service that Plaintiff provides in its community. Together with its partners, the National Council of Jewish Women, Greater New Orleans Section co-leads a nonpartisan coalition dedicated to registering voters, providing information about elections, and increasing voter turnout.

14.     In particular, Plaintiff aims to encourage newly eligible voters to participate in the franchise: young people who have just turned 18 and newly naturalized citizens.

15.     Engaging newly eligible voters in groups, such as at naturalization ceremonies, allows Plaintiff to reach far more unregistered voters than it otherwise could. By contrast, non-targeted outreach, such as setting up registration drives in public places around the community, produces limited results because passersby are often already registered, and there is no way to identify newly eligible voters to approach them individually, encourage them, and answer their questions.

16.     To that end, Plaintiff and its coalition partners coordinate registration drives at every public high school in New Orleans. And until recently, they provided voter registration

assistance to new Americans at their administrative naturalization ceremonies. These settings provide a unique opportunity for Plaintiff to register dozens of new voters at once.

17.    Plaintiff's work at administrative naturalization ceremonies was consistent and effective. At each ceremony, Plaintiff's members and volunteers explained the registration process, helped new citizens complete the forms, answered questions, and encouraged new citizens to vote. Plaintiff then gathered the new citizens' completed forms and submitted them to the registrar of voters in person. Through these efforts, Plaintiff has helped thousands of new citizens register to vote.

18.    The act of welcoming new citizens as voters also served as an expression of Plaintiff's religious faith. Grounded in the Jewish people's history as outcasts in Egypt, the principle of *Hachnasat Orchim*—welcoming the stranger—is a core ethical imperative in the Jewish faith, appearing more times in the Torah than any other command. The Torah also requires civic engagement, not only within Jewish communities but in society at large. Accordingly, many Rabbis and sages have framed voting as a mitzvah—a commandment or sacred obligation. Registering new citizens at naturalization ceremonies was a way to both serve the community and express core Jewish principles.

19.    Helping new citizens vote was also a way Plaintiff and its members honor their Jewish history. Like many Jewish Americans, a large percentage of Plaintiff's members are the children and grandchildren of immigrants who fled to America to escape religious oppression, including survivors of the Holocaust. Plaintiff and its members honor this history by welcoming immigrants who, like many of their ancestors, chose to become Americans.

20.    After USCIS categorically banned non-governmental organizations like National Council of Jewish Women, Greater New Orleans Section from providing voter registration

assistance at naturalization ceremonies, Plaintiff has tried to find another way to help new citizens register. Plaintiff can provide assistance at "judicial" naturalization ceremonies, which are overseen by federal judges—but these occur only a few times a year. The vast majority of new citizens are naturalized at administrative ceremonies. Without access to them, there is no other way for Plaintiff to identify new citizens to register them *en masse*.

21.     As a result, the voter-assistance ban eviscerates a core component of Plaintiff's voter registration program and mission. It prevents Plaintiff and its members from welcoming new citizens and encouraging their participation as voters—a message central to both their civic mission and religious beliefs.

22.     Defendant USCIS is a component of the Department of Homeland Security (DHS), charged with implementing national immigration policies, including the naturalization of new citizens. *See* 6 U.S.C. § 271. USCIS is headquartered in Camp Springs, Maryland, in Prince George's County.

23.     Defendant Joseph B. Edlow is the Director of USCIS. He has served in that role since July 2025. As USCIS Director, he establishes USCIS's policies and priorities, *see id.* § 271(a)(3)(D). He is sued in his official capacity and based at USCIS headquarters in Camp Springs, MD, in Prince George's County.

24.     Defendant DHS is an executive department and cabinet-level agency of the United States, responsible for immigration and customs. *See id.* § 111. DHS is headquartered in Washington, DC.

25.     Defendant Kristi Noem is the Secretary of DHS, serving in that role since January 2025. As the head of DHS, she oversees the responsibilities and functions of the department and

its components, including USCIS. *See id.* § 112. Noem is sued in her official capacity and based at DHS headquarters in Washington, DC.

## STATEMENT OF FACTS

**A.    New Americans face distinctive barriers to voter registration.**

26.    Every year in the United States, hundreds of thousands of people become new American citizens through the naturalization process. In 2024 alone, the United States gained more than 800,000 new citizens through naturalization.

27.    Naturalized citizens are an increasingly significant portion of the American electorate. In 2000, they constituted about five percent of the eligible voter population; by 2024, more than one in ten eligible voters were naturalized citizens. In the 2020 presidential race, the total number of naturalized citizens who were eligible to vote exceeded the margins of victory in virtually every key swing state.

28.    Meanwhile, millions of immigrants are currently eligible to naturalize. As of early 2024, there were 7.4 million immigrants eligible to become citizens.

29.    In most cases, the final step of the naturalization process is an "administrative" naturalization ceremony conducted by USCIS, where new citizens swear an oath of allegiance to the United States and receive a naturalization certificate.[1] Upon completion of this process, "[a] naturalized citizen" becomes a full member of our democracy, "possessing all the rights of a native citizen." *Osborn v. Bank of the U.S.*, 22 U.S. (9. Wheat) 738, 827 (1824) (Marshall, C.J.); *accord Schneider v. Rusk*, 377 U.S. 163, 165–66 (1964) ("[T]he rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive."); *cf. Afroyim v. Rusk*,

---

[1] Less commonly, naturalizations can occur at "judicial" ceremonies, which take place before a federal judge.

387 U.S. 253, 261–62 (1967) (recognizing equivalence of natural-born and naturalized citizenship under Fourteenth Amendment).

30.     Chief among a naturalized citizen's new rights is the right to vote—"the citizen's link to his laws and government." *Evans v. Cornman*, 398 U.S. 419, 422 (1970); *cf. Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir.) (recognizing that voting constitutes "the opportunity to participate in the collective decision making of a democratic society and to add one's own perspective to that of his or her fellow citizens"), *overruled on other grounds*, 975 F.3d 1016 (11th Cir. 2020) (en banc).

31.     Yet naturalized citizens participate in the franchise at far lower rates than native-born citizens do. The key driver of this gap is a significantly lower voter registration rate. Once registered to vote, naturalized citizens typically become highly engaged voters, turning out at similar rates as native-born citizens. But for many new Americans, several factors make registration more difficult.

32.     To start, although the United States's naturalization test requires basic English, many naturalized citizens do not speak English fluently. Navigating voter registration forms— which often include legalese and unfamiliar terms—is daunting for new English speakers. And indeed, studies have confirmed that translating voter registration materials increases new citizens' registration rates.

33.     For many naturalized citizens—especially those who come from authoritarian countries—registering to vote requires also overcoming mistrust about how the government might use the information or fear about (for example) being listed in a database as a member of the opposition party.

34.     Even after new citizens register, it can be harder for them to *stay* registered. Naturalized citizens are more likely than native-born citizens to be purged from the rolls after citizenship checks conducted with inaccurate databases, which may flag outdated information from before a citizen was naturalized.

**B.      USCIS once empowered civic organizations to help overcome those barriers.**

35.     To ensure that new citizens can successfully register to vote, in 2011, USCIS revised its guidance for administrative naturalization ceremonies, committing to give every new citizen the opportunity to register—and to allow nongovernmental organizations to help them do so. *See* Attachment A at 7–10.

36.     Specifically, the 2011 guidance confirmed that USCIS would provide "[a]ll newly naturalized citizens . . . the opportunity to receive a voter registration application at administrative naturalization ceremonies." *Id.* at 7. The guidance then established three options for carrying out this commitment, listed in order of USCIS's preference.

37.     First, the 2011 guidance explained, the "optimal mechanism for distribution" of voter registration assistance was in-person registration services provided at the naturalization ceremony by state or local election officials. *Id.* at 8. When state and local officials had capacity to help new citizens register to vote, they would be responsible for the provision of voter registration assistance at administrative naturalization ceremonies, including collecting completed forms.

38.     Second, where state or local election officials were unable to provide this assistance, nonpartisan NGOs could fill the gap—distributing voter registration forms, assisting new citizens with completing them, reviewing the forms once they were submitted, collecting the forms to submit them, and providing nonpartisan information about the voting process.

39.     Finally, where neither state or local officials nor NGOs could provide voter registration assistance, USCIS would still provide voter registration applications to all new citizens. But USCIS was "not responsible for the collection of [voter registration] applications or any other activities related to voter registration." *Id.* at 8. In other words, new citizens would receive registration forms, but no guidance for completing and submitting them.

40.     The 2011 guidance established a simple process for USCIS to approve NGOs to assist naturalized citizens with voter registration. Interested organizations were directed to submit to USCIS a request in writing, to which USCIS was directed to respond within 60 days of receipt. The 2011 guidance allowed USCIS to grant one-time or standing approval to NGOs, which remained subject to listed participation requirements, including NGOs' agreement to refrain from participating in partisan or political activity. *Id.* at 8–9.

41.     The 2011 guidance also allowed NGOs to offer other volunteer services at naturalization ceremonies, like providing remarks to new citizens. In that context, too, USCIS field leadership was required to "review the qualifications, designate the level of participation, and oversee the participation of [such] volunteers and organizations during the administrative naturalization ceremony." *Id.* at 10.

42.     Accordingly, for nearly 15 years, under the 2011 guidance, where state and local officials were not able to provide voter registration services, NGOs have served a vital role for newly naturalized citizens in countless jurisdictions nationwide.

43.     Over that same time period, the gap in voter registration between native-born and naturalized citizens dropped nearly by half—from approximately 12 points in 2008 to a 7-point gap in 2024.

11

**C.    With USCIS's authorization, Plaintiff helped thousands of new citizens register to vote.**

44.     Pursuant to the 2011 guidance, in 2018, the National Council of Jewish Women, Greater New Orleans Section launched a program in partnership with other local organizations to help naturalized citizens register to vote at their naturalization ceremonies.

45.     Plaintiff and its members attended ceremonies at least two or three times every month, sometimes as often as once a week—and registered 30 to 50 new voters each time. Even during the COVID-19 pandemic, when Plaintiff could send only one volunteer, Plaintiff regularly helped 50 people register after every ceremony.

46.     Plaintiff found that new citizens often needed Plaintiff and its members' help and encouragement to successfully register. To start, many of the new citizens spoke only basic English, and they could not understand Louisiana's voter registration application. Sometimes this was because the words themselves were legalistic (like "eligibility" and "attestation"). Other times, it was because certain information on the forms does not easily translate to people from other cultures.

47.     For example, the registration form requests the applicant's mother's maiden name. But for people from some countries, the concept of a "maiden name" is entirely foreign. In many Latin American countries, children take both parents' surnames, and women do not change their names after marriage. In China, both parents typically keep their names, and children can take either one. Many new citizens with two last names—as is common in Latin America—were also confused about which to list in the "last name" field and which to list as a "middle" name.

48.     To make the registration form easier to navigate, Plaintiff and its members prepared the printed forms by highlighting the fields that new citizens had to complete and leaving out the fields that were optional. Plaintiff created templates of the registration form in four languages—

12

Spanish, Arabic, Mandarin, and Vietnamese. And when new citizens had questions about the forms, Plaintiff and its members were there to answer them.

49.     For new citizens who were rushing back to work, Plaintiff created a large sign with a QR code that linked to Louisiana's online voter registration form, along with a card explaining how to submit it.

50.     Above all, naturalization ceremonies provided Plaintiff and its members a singular opportunity to encourage new citizens to participate in our democracy—and to send new citizens the message that their vote is welcome and has value. They cheered for new citizens after they took their oaths and greeted them with registration forms, pens, candy, and pins of the American flag. They emphasized to new Americans that voting is the most important responsibility one has as a citizen—it doesn't matter who you vote for, but you should be sure your voice is counted.

51.     Many new citizens needed this support in order to successfully register to vote. Some new citizens told Plaintiff and its members that they were afraid to register. Some thought they needed to get a passport first, to somehow make their citizenship more secure. Others were worried voter registration could make them targets in some way.

52.     Through preparation, assistance, and encouragement, week after week and month after month, Plaintiff helped new citizens overcome fear, confusion, and hesitation, and join their new nation as voters.

53.     Ultimately, Plaintiff successfully registered thousands of new Americans to vote.

**D.     USCIS's 2025 voter-assistance ban prevents civic organizations from helping new citizens vote.**

54.     In August, despite years of successful partnership with civic organizations, USCIS halted Plaintiffs' efforts—and those of others like it—to help new citizens register to vote. On August 29, 2025, USCIS issued Policy Alert No. PA-2025-21 (the "Voter Assistance Ban"),

announcing revisions to the guidance in the USCIS Policy Manual. *See* Attachment B. The alert announced that, "effective immediately," NGOs were categorically barred from providing voter registration services at administrative naturalization ceremonies. *Id.* at 1.

55.     Now, when state and local officials are unavailable to help new citizens register to vote, there are no other options. NGOs like Plaintiff that have filled the gap for years on this issue are shut out. And the new citizens whom they would have assisted with voter registration will instead receive forms from USCIS staff, who are not authorized to collect the forms, submit them, or answer any questions about how to complete the forms.

56.     This policy change surgically targets naturalized citizens and their exercise of the franchise. In other federal facilities that do not primarily serve newly naturalized citizens, NGOs are still permitted to help people register to vote. For example, the Department of Defense operates a federal voting assistance program, which permits NGOs to provide voter registration assistance on military bases. And the Postal Service still allows NGOs to register voters in post offices. On information and belief, administrative naturalization ceremonies—where, by definition, the people that NGOs assist are new Americans—are the only settings from which NGOs have been categorically barred from helping people register.

57.     Moreover, while the Voter Assistance Ban bars NGOs from providing assistance with voter registration, it still allows them to participate in naturalization ceremonies in other ways, like providing entertainment. *See* Attachment C at 7. Indeed, the USCIS website lists "participating in a naturalization ceremony" as one of the ways in which organizations can "play an important role in supporting immigrants through the naturalization process." In other words, NGOs can still participate in naturalization ceremonies—just not to help new citizens become full participants in our democracy.

14

58.    For the NGOs who focus on registering new voters, the Voter Assistance Ban eliminates the single best—and arguably, the only—option for finding and registering these voters *en masse*. Outside of rare judicial ceremonies, there is no equivalent place where naturalized citizens are likely to gather—and thus, no straightforward way to find new Americans to help them register.

59.    Plaintiff's experience after the ban illustrates the point. After USCIS issued the Voter Assistance Ban in August, Plaintiff considered asking the building where the ceremonies take place for permission to set up a registration table outside. But Plaintiff had no information about when naturalization ceremonies were taking place. And even if it did, the ceremonies typically took place on the 18th floor of a large building—once new citizens left the ceremonies, they became part of the crowd, and Plaintiff would have no way to identify them.

60.    Thus, by barring NGOs from assisting new citizens at naturalization ceremonies, USCIS effectively bars them from making targeted efforts to help them register to vote.

**E.    USCIS's voter-assistance ban reflects a broader campaign to suppress naturalized citizens' civic power.**

61.    The Voter Assistance Ban aligns with a broader effort by Defendants and others in the Executive Branch to reduce naturalized citizens' electoral power.

62.    In recent years, as naturalized citizens have become an increasingly significant portion of the American electorate, officials who now have key leadership roles in the Executive Branch have cast immigrants as an existential threat to the United States—particularly because they may become voters. Vice President J.D. Vance has accused the Democratic Party (without evidence) of encouraging an "invasion" of immigrants to "bring a large number of new voters to replace the voters we already have." White House "Border Czar" Tom Homan similarly posited

that the Biden administration was encouraging immigration because of its potential to create "future Democratic voters."

63.    Like others in the Executive Branch, DHS Secretary Noem and USCIS Director Edlow have openly touted the theory that the prior administration aimed to admit and naturalize immigrants to gain electoral power. In a 2024 interview, for instance, while former President Biden was in office, Secretary Noem claimed: "The White House has [an] invasion happening on purpose and it is to remake the foundation of this country." In July of this year, citing this and a litany of similar statements, a federal judge concluded that Secretary Noem is perpetuating "the discriminatory belief that certain immigrant populations will replace the white population." *Nat'l TPS Alliance v. Noem*, No. 25-cv-05687-TLT, 2025 WL 2233985, at *16 (N.D. Cal. July 31, 2025), *appeal docketed*, No. 25-4901 (9th Cir. Aug. 4, 2025).

64.    Likewise, on August 13, 2025—just weeks before USCIS instituted the Voter Assistance Ban on August 29—USCIS Director Edlow openly touted the theory that the prior administration wanted to grant amnesty to "[the] illegal population . . . make them all citizens, and then spread them out to try to change demographics elsewhere in the country."

65.    Fueled by this hostility to the changing electorate, the ban on voter assistance at naturalization ceremonies is one prong in Defendants' and other officials' broader effort to ensure that new Americans cannot exert their democratic will on the nation. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 725–26 (9th Cir. 2025) (finding that the "political climate" surrounding the passage of certain voting restrictions, including specious claims about noncitizen voters, was evidence that the voting restrictions were passed with an intent to discriminate based on race or national origin).

66.     In the months and weeks leading up to the Voter Assistance Ban, DHS, USCIS, and other Executive Branch officials made a series of policy changes that make it harder for new citizens to access the franchise, make their citizenship status more precarious, and make it more difficult to naturalize in the first place.

67.     For example, in April 2025, USCIS announced a dramatic expansion of the Systemic Alien Verification for Entitlements ("SAVE") database—created to verify immigrants' eligibility for government benefits like food stamps and Medicaid—and encouraged states to use it to "verify[]" voters' citizenship. Because SAVE is not a reliable database for checking voter eligibility, its use for that purpose risks disproportionately flagging naturalized citizens as ineligible noncitizens.

68.     The SAVE database was not designed for verifying voter qualifications, and its data has never been comprehensive or reliably accurate, since many of the sources it relies on are outdated or incomplete. In a 2016 review by the Government Accountability Office, about 18.7% of queries submitted to SAVE did not yield a definitive determination about citizenship. In Texas, where officials have begun relying on SAVE to check its voter rolls, public records suggest that the updated SAVE system is returning errors for 17% of records searched with full social security numbers.

69.     Naturalized citizens are uniquely vulnerable to being erroneously flagged as noncitizens, since the data sources SAVE relies upon regularly include information that pre-dates naturalization. Given this, both elected officials and advocates have raised repeated public concerns about the risk that SAVE will exclude naturalized citizens from the franchise or even expose them to investigations for voter fraud based on faulty data.

70. Meanwhile, in March of this year, President Trump issued an Executive Order that, among other things, would require anyone registering to vote in federal elections to provide documentary proof that they are citizens. But not any proof will suffice. Although the Executive Order lists other documents (like a U.S. passport) as acceptable proof, it does *not* allow naturalization documents—the proof new Americans are most likely to have. Even absent this illogical (and targeted) omission, new citizens would face special barriers to registration under this law; naturalization certificates cost more than $500 and take up to five and a half months to replace if lost or destroyed.[2]

71. At the same time, Defendants and other Executive Branch officials have taken actions to make new citizens' status as Americans more tenuous.

72. In June, for example, the Department of Justice announced that it would "maximally pursue" the denaturalization of U.S. citizens, making it a top priority.

73. This effort to expand (and publicly threaten) denaturalization inherently targets new Americans, since U.S.-born citizens cannot be stripped of citizenship outside of rare and narrow circumstances (like entering the armed forces of a foreign government that is engaged in hostilities against the United States).

74. The last time the United States engaged in a concerted denaturalization effort was during the McCarthy era, when denaturalization was used as a political tool to strip immigrants of their citizenship for allegedly "un-American" activities, which typically meant ties to groups that held—or were accused of holding—political beliefs the administration disfavored, like support for communism. The Supreme Court halted this campaign with its decision in *Afroyim v. Rusk*, 387

---

[2] The documentary proof-of-citizenship requirement has been permanently enjoined. *League of United Latin Am. Citizens v. Exec. Office of Pres.*, Nos. 25-0946, 25-0952, 25-0955, 2025 WL 3042704, at *38 (D.D.C. Oct. 31, 2025).

U.S. 253 (1967), where it held that, unless obtained by fraud, citizenship may not be stripped without a person's consent. In doing so, Justice Hugo Black explained, "The very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship." *Id.* at 268.

75.     Since that time, denaturalization has been exceedingly rare. Between 1994 and 2017, the United States opened an average of 11 denaturalization cases per year. The first Trump administration and the Biden administration opened 102 and 24 denaturalized cases respectively over the entirety of their four-year terms.

76.     Under this administration, however, the U.S. Department of Justice's public guidance to prosecutors encourages them to seek denaturalization based on wide-ranging grounds, including in connection with "pending criminal charges"; based on a "potential" threat to national security or a "nexus to terrorism"; and against any citizen the Department "determines to be sufficiently important to pursue."[3]

77.     This unprecedented push for denaturalization is almost certain to chill new citizens from participating in their democracy. By prioritizing denaturalization and encouraging it on such broad grounds, officials are sending a clear message that naturalized Americans enjoy only "a second-class citizenship," *Schneider*, 377 U.S. at 169, and must proceed with caution if they wish to keep it. As the American Immigration Lawyers' Association observed, "by casting doubt on the

---

[3] *See also, e.g.*, Anthony Barnett, *Stephen Miller Calls Democrats a "Domestic Extremist Organization,"* The Nation (Sep. 3, 2025), https://www.thenation.com/article/politics/democrats-trump-immigration-democracy (White House Deputy Chief of Staff Stephen Miller stating, "The Democrat Party . . . is an entity devoted exclusively to the defense of hardened criminals, gang-bangers, and illegal, alien killers and terrorists. The Democrat Party is not a political party. It is a domestic extremist organization." (emphasis and alteration omitted)).

finality of naturalization, the Administration discourages eligible individuals from pursuing the process and dissuades citizens from fully engaging in civic life."

78.    Alongside this denaturalization initiative, the Justice Department recently announced that it has begun sharing the State voter rolls it recently demanded from election officials in nearly two dozen states with DHS, purportedly so that DHS can investigate voting by noncitizens and "scrub aliens from voter rolls." In light of this effort, naturalized citizens may be chilled from registering to vote at all because (for example) they reasonably fear that being listed on state voter rolls as a member of the Democratic Party—which the White House Deputy Chief of Staff has called a "domestic extremist organization"—may expose them to greater scrutiny, investigation, or even denaturalization.[4]

79.    In addition to these direct efforts to suppress civic participation by new citizens, USCIS has taken actions that will make naturalization harder in the first place—including by making it easier for the government to deny citizenship to people it disfavors. For instance, within days of issuing the new guidance barring NGOs from providing voter registration assistance at naturalization ceremonies, Defendant USCIS Director Edlow announced plans to make the test for U.S. citizenship more difficult and, critically, more subjective, proposing (for example) a new essay question that will allow USCIS to judge the applicant's "attachment to the Constitution."

80.    At the same time, USCIS announced plans to vet immigrants for "anti-American" views when it decides whether to grant certain benefits—including naturalization. In an interview, Director Edlow explained that USCIS will now vet applicants' social media for "anti-American activities," noting that even "a single post saying they hate America or that they're supportive of,

---

[4] *See id.*

you know, certain individuals in Gaza," would be part of USCIS's analysis when it makes discretionary decisions, even if, standing alone, that fact would not be a sufficient basis for denial.

81.    USCIS's Voter Assistance Ban is of a piece with these efforts to beat back the purported threat of new citizen voters by making voting more difficult and citizenship status more dependent on officials' favor—all of which turns on the faulty premise that some citizens are somehow more valid members of American society than others. *But see Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) at 827 ("[The naturalized citizen] becomes a member of the society, possessing all rights of a native citizen, and standing, in view of the constitution, on the footing of a native.").

82.    Another factor speaks to Defendants' intent as well. In addition to adding the Voter Assistance Ban, the 2025 guidance makes certain other changes too. The 2011 guidance requires that new citizens receive, among other materials, "A Voter's Guide to Federal Elections" as part of a welcome packet. Attachment A at 2–3. The 2025 guidance does not mention it. *See* Attachment C. The 2025 guidance also strips out language that frames voting as a responsibility, as well as a basic right. *Compare, e.g.*, Attachment A at 7 ("The ability to vote in federal elections is both a right *and responsibility* that comes with U.S. citizenship." (emphasis added)), *with* Attachment C at 5 ("The ability to vote in federal elections is a fundamental right that comes with U.S. citizenship."). And it changes the term "naturalization candidate" to "alien." *Compare, e.g.*, Attachment A at 2, *with* Attachment C at 1.[5]

---

[5] In addition, the 2011 guidance requires USCIS to give naturalized citizens a copy of the Declaration of Independence and U.S. Constitution. Attachment A at 3 ("[A] Pocket-size Declaration of Independence and Constitution of the United States . . . must be made available to all interested naturalization candidates or newly naturalized citizens."). The 2025 guidance makes that optional. Attachment C at 1 ("Officers may make these publications available during administrative ceremonies but are not required to do so.").

83.    Indeed, even the 2025 Policy Alert that announced the Voter Assistance Ban reflects the view that naturalized citizens have a different status than native-born citizens. In explaining the Ban, USCIS incorrectly refers to new Americans as "aliens" rather than recognizing them as *citizens*, with the same rights in our democracy as those made Americans at birth. *Compare* Attachment B at 3 ("USCIS does not believe that *aliens* or nongovernmental organizations have any reliance interests related to representatives of nongovernmental organizations being present at naturalization ceremonies." (emphasis added)), *with* 8 U.S.C. § 1101(a)(3) (defining "alien" as "any person not a citizen or national of the United States"). *See also Flowers v. Mississippi*, 588 U.S. 284 (2019) ("[I]ncorrect statements . . . can be another clue showing discriminatory intent.").

**F.    USCIS offers only illogical and pretextual justifications for the ban.**

84.    To justify its drastic and consequential policy change, USCIS offers only two paragraphs of boilerplate—but neither plausibly explains the ban on voter assistance by NGOs.

85.    To start, USCIS asserts that it implemented the Voter Assistance Ban to comply with two Executive Orders issued by President Trump, one of which rescinded a previous Executive Order by former President Biden requiring federal agencies to cooperate with NGOs to expand opportunities for voter registration, and the other of which required the heads of agencies to cease all actions implementing the rescinded order. Attachment B at 1. But the policy that the 2025 Policy Alert reverses came from the 2011 Guidance, not from former President Biden's Executive Order.

86.    USCIS also states that it implemented the ban because USCIS "does not primarily rely on nongovernment organizations for voter registration services," so "the use of nongovernmental organizations was sporadic and varied based upon the location." *Id.* at 2. This justification also makes no sense. Under the 2011 Guidance, the very purpose of cooperating with NGOs was to ensure the availability of voter registration assistance when state and local officials

were unavailable to provide it. The option for NGOs to provide voter registration assistance was never designed to be uniformly provided—but rather, it was designed to *provide* uniformity by filling in the gaps. But if the uneven use of NGOs for voter registration assistance were truly a problem (USCIS never explains what issue it causes), the uneven availability of state and local officials to provide assistance would cause the same issues.

87.    Finally, the government argues that the policy change is necessary to reduce "the administrative burden on USCIS to ensure that those nongovernmental organizations who provide voter registration services are nonpartisan." *Id.* But there is no reason to believe this vetting would impose an administrative burden in the first place. The Internal Revenue Service already vets many nongovernmental organizations to ensure that they do not engage in any partisan activity, including that any voter education or registration activities are conducted in a nonpartisan manner, and organizations then must file an annual tax return disclosing their activities.

88.    Additionally, many of the NGOs providing voter registration services have already been vetted by USCIS, and, on information and belief, have been granted "standing approval." For those organizations that have been granted such standing approval, USCIS would face minimal additional administrative burden to ensure the non-partisan nature of the services provided. And, at any rate, USCIS provided no specific information describing or quantifying any administrative resource savings that this policy would achieve.

89.    Moreover, if vetting were truly burdensome, USCIS does not explain why only voter registration and education activities are singled out by USCIS's new policy, while USCIS continues to allow NGOs to provide *other* volunteer services at naturalization ceremonies, which imposes similar vetting requirements (and, thus, a similar administrative burden) on the agency. To wit, USCIS "[f]ield leadership" is still required to "review the qualifications, designate the level

of participation, and oversee the participation of all volunteers and organizations during the administrative naturalization ceremony." Attachment C at 7.

90.     The Voter Assistance Ban also *imposes* an administrative burden on USCIS that would otherwise not exist. Under the new policy, when state and local elections officials are not available, USCIS will be required to distribute voter registration forms to naturalized citizens (albeit without collecting them or providing any other assistance). Before the Ban, there was no need to do this when NGOs were available to assist voters.

91.     After failing to provide any credible policy justifications for its decision, USCIS broadly asserts that the Voter Assistance Ban will have no impact at all. Banning NGOs from providing voter assistance at naturalization ceremonies, it claims, "in no way impacts new citizens' access to information and applications to register to vote, as this information will continue to be provided by state or local election officials, or USCIS staff at the end of naturalization ceremonies." Attachment B at 3.

92.     But the guidance itself contradicts USCIS's claims. State and local election officials will not be able to provide the services previously provided by NGOs because the policy that the Voter Assistance Ban revokes allowed NGOs to provide voter registration assistance *when state and local officials were unavailable. See* Attachment A at 8. Assistance by NGOs was only available when state and local election officials were not. And USCIS staff cannot fill the void left by NGOs and provide new citizens with "access to information" because USCIS expressly disclaims responsibility for collecting registration forms and assisting voters with completing them. *See* Attachment C at 6.

93.     More broadly, the Voter Assistance Ban prevents organizations like Plaintiff from welcoming naturalized citizens as participants in the franchise. As many courts have recognized,

24

"efforts to register people to vote communicates a message that democratic participation is important." *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1216 (D.N.M. 2010), *on reconsideration in part*, No. CIV 08-0702 JB/WDS, 2010 WL 3834049 (D.N.M. July 28, 2010). Plaintiff's work providing voter registration assistance to new citizens, and the work of organizations like them, not only makes registration easier, but communicates to new citizens that they are welcome as full participants in our democracy. USCIS now bars Plaintiff from sending that message. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) (explaining that "'urging' citizens to register; 'distributing' voter registration forms; 'helping' voters to fill out their forms; and 'asking' for information to verify that registrations were processed successfully" constitutes "constitutionally protected speech").

94.     Finally, USCIS claims that the new citizens NGOs serve do not "have any reliance interests related to representatives of nongovernmental organizations being present at naturalization ceremonies." Attachment C at 3. USCIS is wrong.

95.     Naturalization ceremonies are the single best, and arguably only, place for organizations to identify and register newly naturalized citizens. NGOs throughout the country—including Plaintiff—have focused their voter registration efforts on naturalization ceremonies in reliance on USCIS's longstanding policy, particularly in places where state and local officials are habitually unable to provide the services themselves, precisely for this reason.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of the Right to Equal Protection
### (Fifth Amendment to the U.S. Constitution; 42 U.S.C. § 1983)

96.     Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

97.     The Fifth Amendment bars discrimination on the basis of race or national origin.
*See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954); *Yick Wo v. Hopkins*, 118 U.S. 356, 374
(1886). On its face, the Voter Assistance Ban discriminates based on national origin by barring
NGOs from providing voter registration services during naturalization ceremonies, while still
allowing NGOs to provide those services in other contexts where native-born citizens are more
likely to register to vote.

98.     The Fifth Amendment also bars facially neutral official acts motivated by
discriminatory intent, even if the discriminatory purpose was not the "sole[]" or even a "primary"
motivation of the policy. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir.
2016) (alteration in original) ("Challengers need not show that discriminatory purpose was the
'sole[]' or even a 'primary' motive for the legislation, just that it was '*a* motivating factor'"
(quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977))).
Once racial discrimination is shown to have been a "substantial" or "motivating" factor behind
enactment of the policy, the burden shifts to the policy's defenders to demonstrate that the policy
would have been enacted without this factor. *Hunter v. Underwood*, 471 U.S. 222, 228 (4th Cir.
1985).

99.     To determine whether an official act was motivated by discriminatory intent, courts
assess the "circumstantial and direct evidence of intent . . . available," including whether the law
"bears more heavily on one [protected group] than another," and the "historical background of the

decision . . . , particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 266–67.

100.    Here, the available evidence demonstrates that discriminatory intent motivated the Voter Assistance Ban and that, absent that intent, the Ban would never have been implemented. The Ban *solely* targets naturalized citizens' access to voter registration services. *See id.* at 266 (explaining that sometimes the impact of the government's action is so stark that it is "unexplainable on grounds other than [discrimination]"). It was implemented amid a series of actions by Defendants that discourage naturalized citizens' civic participation—particularly registering to vote and voting. And aside from an intent to discriminate against naturalized citizens, the government has offered no plausible basis for the Ban. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam) ("[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."); *cf. Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 n.5 (1987) ("[D]iscrimination by States on the basis of ancestry violates the Equal Protection Clause of the Fourteenth Amendment." (collecting cases)); *Graham v. Richardson*, 403 U.S. 365, 372 (1971) ("[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate." (internal footnotes and citation omitted)).

## COUNT II

### Violation of Substantive Due Process Rights
### (Fifth Amendment to the U.S. Constitution; 42 U.S.C. § 1983)

101.    Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

102.    The Fifth Amendment's guarantee of substantive due process prohibits the arbitrary exercise of government power. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998);

*Wolff v. McDonald*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of the government."). Executive action is arbitrary in the constitutional sense when it is so egregious that it "shock[s] the contemporary conscience." *Lewis*, 523 U.S. at 848 n.8.

103.    Applying this standard, courts have consistently found that executive action violates due process when it is motivated by discriminatory intent. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("To deny [a] fundamental freedom on so unsupportable a basis as the racial classifications embodied in these statutes . . . is surely to deprive at the State's citizens of liberty without due process of law."); *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954) (finding that racial segregation in schools imposed "a burden that constitutes an arbitrary deprivation of . . . liberty in violation of the Due Process Clause"); *MARJAC, LLC v. Trent*, 380 Fed. App'x 142, 147–48 (3d Cir. 2010) (reversing district court's grant of summary judgment on a substantive due process claim because the "selective enforcement of municipal zoning laws . . . motivated by antipathy toward Italians" could "shock the conscience"); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 326–27 (D. Md. 2018) (finding that plaintiffs stated a substantive due process claim where they alleged that the President "intentionally . . . terminate[d] [temporary protected status for El Salvadorans] due to anti-Latino animus"); *see also id.* at 327 ("[O]ne can hardly think of a more arbitrary motivation for executive action than racial discrimination.").

104.    Here, the only plausible basis for the Voter Assistance Ban is to discriminate against new citizens based on national origin. By imposing the ban, Defendants make voter registration more difficult for newly naturalized citizens by foreclosing Plaintiff and its members from welcoming these new citizens by helping them register to vote. Taking executive action to

reduce naturalized citizens' access to the most foundational right in our democracy is the quintessence of arbitrary conduct that shocks the conscience.

### COUNT III

### Violation of Free Expression and Association Rights
### (First Amendment to the U.S. Constitution; 42 U.S.C. § 1983)

105.    Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

106.    "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). Accordingly, the government may not exclude private speakers from a government-created forum—even a nonpublic forum—based on their viewpoint. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). And when the government "denies access to a speaker solely to suppress the point of view he espouses," this violates the First Amendment. *Id.* Moreover, even viewpoint-neutral restrictions on access must be "reasonable" in light of the purpose of the forum. *Id.*

107.    For years, Plaintiff has provided voter registration services at administrative naturalization ceremonies to express their viewpoint that naturalized citizens should be embraced as full participants in our democracy. *See Tenn. State Conf. of NAACP v. Hargett*, 420 F. Supp. 3d 683, 704 (M.D. Tenn. 2019) (finding that private parties who engage in voter registration assistance are advocating for "a particular change, namely the creation of new registered voters and, by extension, a change in the composition of the electorate"); *Am. Ass'n of People with Disabilities*, 690 F. Supp. 2d at 1215–16 (finding that an organization's "public endeavors to assist people with voter registration are intended to convey a message that voting is important, that the Plaintiff believes in civic participation, and that the Plaintiff is willing to expend the resources to

broaden the electorate to include allegedly under-served communities," and thus is expressive conduct which implicates the First Amendment).

108.    With the Voter Assistance Ban, Defendants now foreclose Plaintiff's "access to the most effective, fundamental, and perhaps economical avenue" for expressing this viewpoint. *Meyer v. Grant*, 486 U.S. 414, 424 (1988); *see id.* ("The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."). Meanwhile, USCIS policy still allows NGOs to provide *other* volunteer services at naturalization ceremonies. And in other contexts not focused on naturalized citizens, NGOs are not categorically barred from helping people register to vote. There is no reasonable basis for this distinction, and it serves no governmental interest other than to overtly and unlawfully discriminate based on viewpoint to prevents Plaintiff from encouraging democratic participation by naturalized citizens—the very people whose participation Defendants seek to chill.

**COUNT IV**

**Violation of the Administrative Procedure Act: Arbitrary and Capricious Agency Action
(5 U.S.C. § 706(2)(A))**

109.    Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

110.    The APA permits judicial review of "final agency action." 5 U.S.C. § 704. Agency action is final when two conditions have been met: (1) the "action . . . mark[s] the consummation of the agency's decisionmaking process," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted) (citation omitted); and (2) "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow," *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Spear*, 520 U.S. at 177–78).

111.    The Voter Assistance Ban is final agency action. By establishing that its guidance "is controlling and supersedes any related prior guidance," USCIS has made clear that it marks the

consummation of the agency's decisionmaking process; and because the revisions to the guidance are "effective immediately," and apply to any and all ceremonies held on or after August 29, 2025, USCIS has ensured that legal consequences will immediately flow therefrom. Attachment B at 1; *see also, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (finding that agency guidance was final agency action where it represented a settled agency position with immediate consequences on the plaintiffs).

112.    Section 706(2)(A) directs courts to "hold unlawful and set aside agency action" that is found to be "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

113.    Agency action is "arbitrary" or "capricious" if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). Agencies may not offer "contrived reasons" for their decisions, *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019), nor can they "ignore an important aspect of the problem," *Ohio v. EPA*, 603 U.S. at 293 (internal quotation marks omitted) (citation omitted). Rather, courts must ensure that an agency has "offered a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.* (alteration in original) (internal quotation marks omitted) (citation omitted). And "when [an agency's] prior policy has engendered serious reliance interests," it "would be arbitrary or capricious to ignore such matters." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When an agency's action is unlawful, "vacatur is the normal remedy." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (citation omitted).

114.    USCIS's Voter Assistance Ban is arbitrary and capricious.

115.    USCIS offered an explanation for the policy that runs counter to the evidence and ignores obvious issues stemming from the Voter Assistance Ban. USCIS's claim that the new

policy "in no way impacts new citizens' access to information and applications to register to vote" is flatly wrong. Attachment B at 3. It ignores the fact that USCIS does not provide the sort of robust voter registration services that NGOs provide at naturalization ceremonies. And USCIS cannot rely on state and local officials to provide voter registration assistance because NGOs only provided those services where state and local officials were unable to do so. *See* Attachment A at 7. USCIS also failed to consider the harm to non-naturalized citizens who will no longer receive the benefit of the services provided by NGO volunteers.

116.    In addition, USCIS entirely ignores Plaintiff's reliance interests on its prior guidance. USCIS erroneously claims that neither "aliens" nor NGOs "*have any reliance interests* related to representatives of nongovernmental organizations being present at naturalization ceremonies" (emphasis added). Attachment B at 3. To the contrary, Plaintiff NGOs have significant reliance interests in the prior guidance. Providing voter registration assistance—at the only venue where new citizens are exclusively gathered—is a crucial pillar of Plaintiff's core mission and activities, which aim to promote the civic engagement of new Americans in the democratic process.

117.    The other reasons USCIS offers for the policy are contrived and do not support it. USCIS claims that the Voter Assistance Ban is partly the result of an attempt to save the resources required to "ensure that those nongovernmental organizations who provide voter registration services are nonpartisan," Attachment B at 2, but many of the NGOs providing voter registration assistance, including Plaintiff, have already been vetted and approved to provide voter registration assistance by USCIS. Moreover, the status of many of the voter assistance NGOs as 501(c)(3) organizations already establishes their nonpartisan nature. Additionally, the Voter Assistance Ban only precludes NGOs from providing voter registration assistance; it does not preclude NGOs from

providing any manner of additional volunteer services at administrative naturalization ceremonies for which USCIS will still need to conduct similar vetting and reviews, suggesting that the real reason for the Ban is not to protect agency resources. And USCIS does not even attempt to describe or quantify any administrative resource savings that the Voter Assistance Ban purports to achieve.

118.    Finally, the Voter Assistance Ban actually imposes new requirements on USCIS where they previously had none. In the absence of NGOs providing voter registration assistance, USCIS itself will be required to provide voter registration forms (without collecting them or providing voter registration assistance).

**COUNT V**

**Violation of the Administrative Procedure Act: Agency Action Contrary to Constitutional Right (5 U.S.C. § 706(2)(B)–(C))**

119.    Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

120.    Section 706(2) directs courts to "hold unlawful and set aside agency action" that is found to be "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C). "An analysis of whether agency action violates the APA because it is contrary to constitutional right mirrors the analysis of whether the agency action violates the relevant constitutional provision." *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 197 (D.N.H. 2025).

121.    The Voter Assistance Ban violates Plaintiff's Fifth Amendment due process and equal protection rights, as well as Plaintiff's First Amendment freedom of expression and associational rights and is therefore contrary to Plaintiff's constitutional rights under the APA. *See* 5 U.S.C. § 706(2)(B).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully asks for the following relief:

122.    Declare that the revisions to the guidance in the USCIS Policy Manual announced by Policy Alert No. PA-2025-21 (the Voter Assistance Ban) violate Plaintiff's equal protection rights under the Fifth Amendment to the U.S. Constitution.

123.    Declare that the Voter Assistance Ban violates Plaintiff's due process rights under the Fifth Amendment to the U.S. Constitution.

124.    Declare that the Voter Assistance Ban violates Plaintiff's free expression and association rights under the First Amendment to the U.S. Constitution.

125.    Declare that the Voter Assistance Ban violates § 706(2) of the APA because it is "arbitrary" and "capricious" and "contrary to [Plaintiff's] constitutional right[s]," and vacate the Voter Assistance Ban, restoring the effectiveness of the prior guidance.

126.    Preliminarily and permanently enjoin Defendants, their officers, agents, servants, and employees from enforcing the Voter Assistance Ban.

127.    Grant Plaintiff any and all other relief as the Court deems just and proper.

Dated: November 7, 2025

Respectfully submitted,

*/s/ Tina Meng Morrison*

**ELIAS LAW GROUP LLP**
Aria C. Branch[Δ][*]
Katie Chamblee-Ryan[*]
Lucas Lallinger[*]
Tina Meng Morrison (D. Md. Bar No. 21832)
Omeed Alerasool[Δ][*]
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
kchambleeryan@elias.law
llallinger@elias.law
tmengmorrison@elias.law
oalerasool@elias.law

[Δ] D. Md. admission pending swearing in
[*] Application *pro hac vice* forthcoming

*Counsel for Plaintiff*